535 So.2d 1173 (1988)
KPW ASSOCIATES, Plaintiff-Appellant,
v.
S.S. KRESGE COMPANY, Defendant-Appellee.
K-MART CORPORATION, Plaintiff-Appellee,
v.
KPW ASSOCIATES, a Limited Partnership, Defendant-Appellant.
Nos. 20,136-CA, 20,137-CA.
Court of Appeal of Louisiana, Second Circuit.
November 30, 1988.
Writ Denied February 17, 1989.
*1175 Cook, Yancey, King & Galloway by Bernard S. Johnson & Curtis R. Shelton, Shreveport, for plaintiff-appellant.
Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman by Pamela C. Walker & Ben R. Miller, Jr., Baton Rouge, for defendant-appellee.
Before JASPER E. JONES, FRED W. JONES, Jr. and LINDSAY, JJ.
LINDSAY, Judge.
These consolidated suits arise from a lease dispute between K-Mart Corporation (formally S.S. Kresge Company) and KPW Associates, a Limited Partnership, (hereinafter referred to as "KPW"), which is the landlord for the K-Mart store in Bossier City, Louisiana. KPW appeals the trial court judgment rejecting its demand to evict K-Mart for nonpayment of rent and which found that K-Mart was entitled to apply rent due under the lease to the cost of resurfacing a substantial portion of the landlord's parking lot. The judgment further ordered KPW to take action to repair the rest of the parking lot in order to put it in compliance with the lease provisions, or, in default thereof, provided that K-Mart was entitled to make the necessary repairs to the parking lot and pay for them with the rent due under the lease. For the following reasons, we affirm the judgment of the trial court.

FACTS
On October 15, 1971, W. Floyd Clark and Harold A. Clark entered into a semi-gross lease with S.S. Kresge Company for a K-Mart store to be built near the intersection of Airline Highway and East Texas Street in Bossier City. By the terms of a semi-gross lease, the landlord is generally responsible for the maintenance of the building's roof, the load-bearing walls, the floor slab, and the parking lot. The lessee performs common area maintenance, which includes striping and/or cleaning of the parking lot.
The K-Mart store opened in October, 1972. Within a few years, difficulties with the parking lot arose, which required the landlord to make repairs, such as filling chuck holes and remedying minor base failures. Usually, the lessor, Clark Development Company, made the requested repairs within a few months of receiving the complaint. In the latter half of 1978, Clark and K-Mart reached an agreement by which K-Mart would consent to Clark's sale to a third party of a portion of the area covered by the lease (referred to as an "outlot"), provided that part of the proceeds from the sale were allotted for parking lot repairs. The outlot sold for $110,000.00, of which $50,000.00 was eventually conveyed to K-Mart. (These funds were ultimately used by K-Mart to make temporary repairs to the parking lot.)
KPW became interested in acquiring the property. The limited partnership was looking for "a virtually certain safe return" on its investment, from which it could count on a certain cash flow. KPW contacted K-Mart to inquire about the condition of the store and its business. Roger D. Stern, the chief operating officer of Kenbee Management, Inc., the general partner of KPW, testified that "someone" in K-Mart's regional office assured him that there were no problems with the store other than routine maintenance. KPW then engaged Law Engineering Testing Co. (LETCO), one of the largest inspection services in the country, to conduct a visual inspection of the premises.
KPW also sent Jordan Wright, a law student and the son of Martin Wright, the chief financial officer of Kenbee, to inspect the property without advance warning. He walked about the store with the assistant manager, John Hoyle. Mr. Hoyle, who was the assistant manager at the Bossier City store until his transfer in April, 1979, testified that he showed around a representative of a prospective buyer about two or three months before his transfer. He testified that they toured the building and the parking lot for two to three hours, most of which time they spent in the parking lot. Mr. Hoyle testified that there were observable chuck holes, cracked asphalt, and one particularly large hole in front of the store. The portion of the parking lot behind the *1176 store was in even worse condition. All these areas were observed by the visitor. Mr. Hoyle further recalled that the man took notes.
Mr. Stern testified that Jordan Wright reported that the area looked "pretty good" and it was "a nice store." He informed Mr. Stern that there were no major problems with the roof or parking lot.
On March 15, 1979, Alan Casnoff of KPW was informed that pothole repairs were to be undertaken on the parking lot, and that Clark Development would agree to complete the work after closing, if necessary.
LETCO conducted its examination of the premises and gave KPW a report by telephone. Martin Wright wrote to Mr. Casnoff, a partner associated with KPW's general counsel, on March 20, 1979, to apprise him of the contents of the telephone call. Mr. Martin wrote, in relevant part:
The parking lot, as we knew, has pot holes and chuck holes. It has not been fixed in a good prescribed manner. They are to be taken care of either by Chodorow or the current owners. Lines are also to be painted. [The engineer] estimates on a continuing basis it would cost approximately $2,500 a year to keep the parking lot in good order, and doing the pot holes in a good prescribed manner.
On March 21, 1979, LETCO issued its written report, which provided in relevant part:
The asphaltic concrete has failed in several areas, creating ruts and potholes. The damage is most severe to the north (rear) of the buildings, probably due to more truck traffic in that area.... Some patching of the pavement has been attempted on more than one occasion; some of these patches have failed.... Judging by the appearance of the potholes, the asphaltic concrete layer is thin (two inches or less) and there is no aggregate base course between the surface and the subgrade of brown silty clay.
The parking area will require periodic repair of isolated pavement failures. Simple filling of potholes with asphaltic concrete should not be considered a longterm repair. All patching should include excavation of the affected area and replacement with sufficient compacted base and asphalt surface.
On March 28, 1979, at the request of the prospective buyers of the property, Mr. John P. Johnson, a vice-president of the K-Mart Corporation, executed a document entitled "Tenant Certification."[1] This document provided, in pertinent part:
3. Insofar as Tenant currently has knowledge, the buildings, Site improvements and the facilities required to be furnished by the landlord in accordance with the terms of the Lease have been completed in all respects, and Tenant will not exercise its right to cancel as contained in Article 6 and 12 of the Lease.
4. Insofar as Tenant currently has knowledge, the landlord has fulfilled all of its representations, warranties and duties under the Lease of an inducement nature.
5. Tenant has no knowledge of any claim under the Lease against landlord or any present defense, offset or credit under the Lease against Tenant's obligation to pay the rent and Tenant's other obligations under the Lease.
* * * * * *
9. This Certification shall be binding upon Tenant and its successors and assigns and shall inure to the benefit of Buyer and its successors and assigns.
On May 29, 1979, Jack B. Gunter, a maintenance supervisor for K-Mart, made his annual inspection of the Bossier City Store. Mr. Gunter personally observed that the lot was not free of fissures or potholes. During his visit, he met with a local contractor to determine the cost of repairing the parking lot. He was informed by the contractor that more than $287,000.00 would be required to make the repairs, which would *1177 require digging out the sunken and broken areas of the parking lot and the potholes, as well as overlaying the area. Learning of the April, 1979, sale of the premises to KPW, Mr. Gunter wrote to Mr. Stern to advise him of the bid.
In July of 1979, a meeting was held between Mr. Stern, Mr. Casnoff, Michael Skyles, K-Mart's real estate department head, and Cesar Rodriquez, a K-Mart real estate representative. The K-Mart representatives stated that they were authorized to contribute $50,000.00 towards repair of the parking lot. K-Mart was unwilling to approach Clark, with whom it had an ongoing business relationship, but indicated that KPW was welcome to seek assistance from Clark in repairing the parking lot.
KPW commissioned an additional study by LETCO. Its report of July 26, 1979, estimated that repair costs would run between $75,000.00 and $90,000.00. This estimate was later raised to $125,000.00. KPW also secured the services of Richard Griswold of Griswold Engineering Company. In November, 1979, Mr. Griswold, a civil engineer and land surveyor, estimated the repair cost would be $273,000.00.
In mid 1980, at KPW's request, Clark agreed to undertake repairs to the entire back parking area at its own expense and under Mr. Griswold's supervision. This work was done. In February, 1981, Mr. Griswold communicated to Mike Becker of KPW that the lot was in a continuing state of decay, and warned that further surface and base failures would continue to occur. In October, 1981, the area recently repaired with Clark's cooperation was already deteriorating rapidly. The contractor who performed the work asserted that it was free of fault as the work had been done under poor weather conditions. (Neither KPW nor Clark apparently took any action against the contractor).
In late 1981 and early 1982, the parties continued to discuss the extremely poor condition of the rear drive area. KPW was apparently willing to authorize only $4,000.00 to $5,000.00 in repairs for resurfacing. A K-Mart representative informed them that the sum suggested was insufficient to carry out even 5% of the necessary work.
In February of 1982, Mr. Griswold informed Mr. Becker that he had met with Mr. Gunter at the K-Mart store. During that meeting, he told Mr. Gunter that Mr. Becker was waiting on the lot repairs until the completion of negotiations on the lease of outlots. KPW proposed that the lease be renegotiated. Alternatively, KPW desired that K-Mart consent to the release of outlots from the lease. Mr. Gunter informed Mr. Becker that immediate repairs were needed, and that securing a new tenant had nothing to do with the lessor's obligation to repair under the lease.
Despite periodic repairs of potholes by KPW, the condition of the parking lot continued to deteriorate. In April, 1982, a customer's car literally had to be towed out of a pothole, and the customer complained that the vehicle was damaged. At this time, Mr. Griswold notified Mr. Becker that a total of five cars had been damaged and that $5,000.00 would repair only one pothole. Between $70,000.00 and $80,000.00 was needed to repair the existing potholes. Mr. Griswold suggested that, if repairs were not forthcoming, lighted barracades should be placed in the worst potholes to protect drivers and their vehicles. On May 6, 1982, K-Mart hired LETCO to compile a report specifying what repairs should be made.
On May 14, 1982, John Johnson of K-Mart sent KPW a formal notice of default arising from its failure to make necessary repairs and to place the parking lot in a serviceable condition, as required by the lease. On May 21, 1982, Stan Marlow of K-Mart notified Mr. Becker that K-Mart would award a contract for the repairs if KPW failed to do so, and that it had already ordered a soil engineering survey.
The 1982 LETCO report stated that the parking lot problems were caused by insufficient thickness of the wearing surface to accommodate existing traffic, and poor subgrade conditions, which were aggravated by poor surface drainage in some areas and lack of proper maintenance. This report *1178 was sent to KPW, which in turn had Mr. Griswold compile his own report.
On June 14, 1982, Mr. Griswold advised KPW that returning the lot to serviceable condition would cost about $307,850.00, but he recommended a budget of $350,000.00. In his "return to serviceability" report, Mr. Griswold stated:
Presently the pavement structure is in a state of complete failure and is judged to be useless. This condition is not total over the entire parking lot but covers the majority of the heavily used areas.
Mr. Griswold based his cost estimates on reconstruction of some areas and patching of others. In his recommendations, Mr. Griswold stated that: (1) the heavily used areas had to be completely reconstructed; (2) the lightly used areas could be repaired by patching; (3) the pavement reconstruction had to have a complete engineering design, including testing; and (4) resident inspection of the new construction had to be provided.
On August 18, 1982, a meeting was held between Mr. Johnson, Mr. Marlow, Mr. Casnoff, and Mr. Stern, at which the Griswold report was discussed. Mr. Stern stated that he felt K-Mart should share the cost of reconstruction and/or agree to renegotiate the lease. Although no agreement was reached at the meeting, KPW agreed to have Mr. Griswold proceed with the paving design.
A few days after the meeting, Mr. Johnson informed Mr. Casnoff that K-Mart would reluctantly accept the scheme of totally reconstructing portions of the lot while patching and repairing the remaining parts, and would also consider the release of outlots to help defray the costs.
In August and September of 1982, both Mr. Griswold and Mr. Marlow wrote Mr. Casnoff of KPW, encouraging that the reconstruction and repair work begin immediately before the onset of bad weather. In another September letter to Casnoff, Mr. Griswold warned that any work that failed to address the subgrade and base course problems would be only stop-gap at best. He also advised that overlays and repair of potholes could only be considered temporary measures. He also cautioned that if they continued as at present, KPW should be prepared to spend between $30,000.00 to $50,000.00 annually for maintenance and repair. He also estimated that $150,000.00 had been spent on the temporary repairs made since early 1980.
KPW continued to repair potholes, but failed to act on the reconstruction plans. K-Mart instructed Mr. Griswold to proceed with the paving design. Final plans were received on February 23, 1983, and sent out for bids. The low bidder was Winford Company, Inc. Pursuant to Mr. Casnoff's request, K-Mart agreed to delay awarding the contract until April 25, 1983. However, Mr. Marlow informed Mr. Casnoff that K-Mart would award the contract if KPW did not.
Days before the April 25th deadline, KPW informed K-Mart that it wanted to hire Winford to do only a test patch of Mr. Griswold's pavement design for $17,000.00. No representative of KPW appeared for the awarding of the contract. K-Mart proceeded to award the contract to Winford. The work implementing Mr. Griswold's pavement design was performed for a total cost of $259,445.67. The design utilized a base of seven inches, then an asphalted concrete layer of one inch. A layer of the fabric Petromat was placed between that layer and the two-inch wearing surface on top.
K-Mart submitted the repair invoice to KPW, which it refused to pay. Consequently, beginning December 1, 1983, K-Mart withheld its rental payments in order to recoup its expenses. After May 1, 1985, K-Mart began tendering rental payments again. KPW refused these tenders, except for one check which was cashed. However, KPW sent K-Mart a check in the amount of the cashed check.
In the meantime, and on March 19, 1984, KPW filed a rule to evict K-Mart for non-payment of rent (# 20,136-CA). K-Mart answered and asserted that KPW refused to repair the parking lot and had thereby breached the lease. It then filed a reconventional demand asking for a judgment *1179 declaring each party's rights under the lease. Additionally, K-Mart filed a separate suit for declaratory judgment, seeking a ruling that it had complied with the lease, that KPW had breached the agreement, and that K-Mart was entitled to reimbursement for the money it spent on repairs (# 20,137-CA). The trial court consolidated the cases on the joint motion of the parties.
Trial was held February 11, 12, and 14, 1986. The parties stipulated to the non-payment of rent, agreeing that KPW need not go forward with its case-in-chief beyond that stipulation. K-Mart was allowed to proceed and put on evidence of its affirmative defenses. K-Mart presented the testimony of Mr. Gunter; James Miller, the manager of K-Mart's real estate-accounting department; John Hoyle, the assistant manager of the Bossier City store in 1979; and Jerry Wayne McCombs, a K-Mart regional maintenance supervisor. It also presented the testimony of Richard Griswold, who was qualified as an expert in civil engineering, and Winston Harald Clisham, who was qualified as an expert in the field of design, construction, reconstruction and maintenance of parking lots. K-Mart also introduced into evidence the deposition of Robert Denny Clark. On rebuttal, KPW presented the testimony of Mr. Stern, and Kenneth M. Hall, who was qualified as an expert in geo-technical engineering, especially in paving science. It also introduced the deposition of K-Mart employees Joseph David Hancammon, who was the store manager, and John P. Johnson.
On November 6, 1987, the trial court issued its written opinion. In it, the court rejected KPW's demand for eviction. It found that KPW failed to make necessary repairs under the lease, and its stop-gap methods were "woefully" inadequate and contrary to the advice of engineers hired by KPW. It further found that the repairs made by K-Mart were indispensable, and the costs for these repairs were just and reasonable. The trial court also held that K-Mart was justified in withholding rentals until it recouped the expenditures it had made in repairing the parking lot. The court recognized K-Mart's error in calculation which had caused it to withhold $40,000.00 more than it was entitled to. (Nonetheless, the trial court noted that K-Mart had charged its landlord a lesser interest than it could have.) The court stated that it thought K-Mart should have sought judicial intervention instead of resorting to self-help. However, it ruled that the jurisprudence favoring the upholding of leases required it to rule in K-Mart's favor on the eviction demand.
A motion to fix the form of the judgment was held on January 14, 1988, and the judgment was signed March 21, 1988. It rejected KPW's eviction demands, but gave it judgment for the $40,752.07 that K-Mart incorrectly withheld but later deposited into the registry of the court. Judgment was also rendered decreeing that KPW was entitled to rentals tendered by K-Mart after it recouped its expenses, as well as future rentals. However, judgment was rendered in favor of K-Mart, declaring that the portion of the parking lot which had not been reconstructed fell below the standard necessary to meet the obligations set forth in the lease. KPW was given thirty days from the signing of the judgment to fulfill its obligation. In default thereof, K-Mart was deemed entitled to place that portion of the lot in compliance and to deduct the repair expenses from its rental payments to KPW.
KPW appealed from the trial court judgment, relying upon five assignments of error. They are:
1. The trial court erred in failing to enforce the tenant certification upon which it supposedly relied in purchasing the property;
2. The trial court erred in rejecting KPW's demand for eviction where K-Mart abused its right of self-help, failed to prove its repairs were indispensable, and failed to prove its repair costs were just and reasonable;
3. The trial court erred in failing to award KPW the withheld rental payments;
4. The trial court erred in applying the doctrine of "judicial control" to avoid eviction;

*1180 5. The trial court erred in holding that KPW was obligated to repair the remaining areas of the parking lot.

ASSIGNMENT NO. 1
In its first assignment of error, KPW complains of the trial court's failure to enforce the tenant certification executed by a representative of K-Mart. KPW argues that it was entitled to rely upon K-Mart's contractual assertions and that K-Mart was estopped to assert otherwise.
The Louisiana Supreme Court defined "equitable estoppel" or "estoppel in pais" in Wilkinson v. Wilkinson, 323 So.2d 120 (La.1975), as:
"... the effect of the voluntary conduct of a party whereby he is barred from asserting rights against another party justifiably relying on such conduct and who has changed his position to his detriment as a result of such reliance. Thus, there are three elements of estoppel: (1) a representation by conduct or words; (2) justifiable reliance; (3) a change in position to one's detriment because of the reliance ... [citations omitted]"
Estoppels, however, are not favored by Louisiana courts. The burden of proving the facts upon which the estoppel is founded, as well as the affirmative showing that the party pleading it was mislead by the acts of the other party and forced to act to his prejudice, rests on the party invoking the doctrine. A party may not invoke the doctrine of equitable estoppel except in good faith and after having exercised such diligence as would reasonably be expected under the prevailing circumstances to avoid mistake or a misunderstanding. Being an equitable remedy, it must be applied with equity. A party cannot successfully invoke estoppel, by claiming that he relied upon representations made by another to his prejudice, if the evidence shows that the party pleading the estoppel had actual knowledge or had ready or convenient means of acquiring knowledge of facts concerning which the representations were made. Twillie v. H.B. Zachry Co., 380 So.2d 747 (La.App. 4th Cir.1980).
We find that, at the least, the first two prerequisite elements for the application of equitable estoppel are lacking. The wording of the tenant certification is such that it only assured that the landlord was not, to the best of the tenant's knowledge at the time of the document's execution, in default under the lease. We observe from the record that, at the time the tenant's certification was executed, Clark and K-Mart were on good terms. Although there had been some problems with the parking lot, Clark had agreed to allot $50,000.00 from the proceeds of its sale of an outlot, a sum which the parties obviously anticipated would cover the cost of repairing the lot. Not until later did K-Mart learn of the extent of the problems and the incumbent expenses. Consequently, at the time of execution, the tenant was satisfied with the landlord's performance of its obligations under the lease.
We note that in Piggly Wiggly of Mansfield, Inc. v. Wolpert Associates, 519 So.2d 371 (La.App. 2d Cir.1988), writ denied 522 So.2d 1098 (La.1988), the execution of an estoppel certificate by the tenant, Piggly Wiggly, was found to constitute an express waiver of its rights to enforce a lease clause by which its lessor was to prohibit any other tenant in the shopping center from selling grocery items. In that case, another store, which opened for business several months before Piggly Wiggly signed the certificate or opened its own store, sold such food items from the date it opened. The certificate provided that neither the landlord nor Piggly Wiggly was in default under the lease and that nothing had occurred which would authorize either party to declare a default.
That case and the present one differ substantially. The wording in the Piggly Wiggly certificate asserted that "no act, omission or event has occurred," whereas the K-Mart certificate was couched in terms of the tenant's knowledge. When Piggly Wiggly signed the certificate, its fellow tenant had already begun selling food items, which violated the provision of Piggly Wiggly's lease obligating the lessor to prevent such sales. The term was clearly violated, and "the act [had] occurred...." *1181 Here, K-Mart was not aware of the extent of the parking lot problem, or that the landlord would not continue to fulfill its ongoing duty to properly maintain the parking lot, when it executed the certificate.
Additionally, were we to construe the tenant certification in the fashion KPW urges, it would effectively prohibit K-Mart from ever complaining of any problems that might arise with the parking lot and thereby relieve KPW of its ongoing obligation under the lease to maintain the property. This we cannot do.
Assuming arguendo that K-Mart's tenant certification was a representation, we find that the element of "justifiable reliance" was clearly lacking under the circumstances of the present case. In view of the information of which KPW had knowledge, we cannot say that a claimed reliance upon the tenant certification was reasonable. KPW had sent Jordan Wright as its representative to view the premises. The testimony of other witnesses established that at the time of Mr. Wright's inspection the parking lot had highly visible potholes and cracks, and the rear service drive was in poor condition. More importantly, KPW was in receipt of LETCO's telephone report and its written report of March 21, 1979, which clearly indicated that, in the words of Mr. Stern, "there were certain problems" with the parking lot. Mr. Stern, an experienced businessman, admitted that he was "concerned" by the report, and knew problems existed. Thus, he said that he had some funds escrowed to apply towards remedying the difficulties.
KPW argues that that the report alerted it only to pavement failures in "isolated" areas. KPW's expert Kenneth Hall testified that the report did not imply that the rest of the base had failed, but acknowledged that one would have to "read between the lines" to conclude that the remaining areas were all right. Richard Griswold testified that he would have told a client considering purchase of the property that, based on the information contained in the report, it could expect to experience considerable problems with the parking lot.
Based on the foregoing, KPW was not justified in relying upon the tenant certification, particularly in view of its possession of the LETCO engineering report that clearly reflected that there were definite problems with the parking lot.
This assignment of error is without merit.

ASSIGNMENT NO. 2
In its second assignment of error, KPW asserts that the trial court erred in rejecting its demand for eviction. It alleges that K-Mart availed itself of, and abused, a "precarious" self-help remedy. Alternatively, it argues that K-Mart's repairs were excessive, both in scope, execution, and expense.
The lease between the parties provides, in relevant part:
15. ... Landlord shall make and pay for all repairs and replacements necessary to maintain all driveways, sidewalks, streets and parking areas located on the demised premises free of all settling, clear of standing water and in a safe, sightly and serviceable condition, free of chuck holes, fissures and cracks. Landlord shall make and pay for all repairs and replacements to underground utility installations in the demised premises, including underground electrical conduits to parking lot light standards.
Tenant, at its expense and as it deems necessary, shall sweep, stripe and keep free from snow and ice the common areas located on the demised premises and shall maintain all aboveground exterior lighting facilities and all painted surfaces on the exterior of Tenant's buildings.
In the event buildings or improvements constituting the demised premises or a portion thereof shall be rendered unusable due to Landlord's default or negligence with respect to required repairs, there shall be a just and equitable abatement of said annual minimum rental and all other charges payable under this lease until said premises shall be made usable. Emergency repairs which shall be Landlord's responsibility hereunder, *1182 and which shall be necessary to protect the building or contents and/or to keep the common areas in a neat, clean, safe and orderly condition may be made by Tenant without notice to Landlord, and the cost of such repairs not to exceed One Thousand Dollars ($1,000.00) in any one instance, may be deducted by Tenant from rentals subsequently accruing hereunder.
30. In the event Landlord shall neglect to pay when due any obligations on any mortgage or encumbrance affecting title to the demised premises and to which this lease shall be subordinate, or shall fail to perform any obligation specified in this lease, then Tenant may, after the continuance of any such default for seven (7) days after notice thereof by Tenant, pay said principal, interest or other charges or cure such default, all on behalf of and at the expense of Landlord, and do all necessary work and make all necessary payments in connection therewith, and Landlord shall, on demand, pay Tenant forthwith the amount so paid by Tenant together with interest thereon at the rate of seven percent (7%) per annum or the then current prime rate, whichever is the higher, and Tenant may withhold any and all rental payments and other payments thereafter due to Landlord and apply the same to the payment of such indebtedness. [Emphasis added]
On December 11, 1972, the Clarks and K-Mart (then S.S. Kresge Co.) entered into a "FIRST AMENDMENT TO LEASE" which made relevant alterations to other provisions of the lease. The relevant provisions, as amended, state as follows:
10. .... Landlord covenants, represents and warrant that, [at the commencement of; deleting "during"] the lease term, there shall be adequate sidewalks, driveways, roadways and entrances for automotive and pedestrian ingress and egress to and from the demised premises and adjacent public streets and highways.
Landlord further covenants that the aggregate area provided for the parking of automobiles shall [at the commencement of; deleting "during"] the lease term be either in the ratio of three (3) square feet of parking area for each square foot of gross floor area....
At least sixty (60) days prior to the commencement of the lease term and [deleting "throughout the lease term"] Landlord shall provide [deleting "and maintain"] paved driveways running from the adjoining public streets around the front, sides and rear of Tenant's buildings in order to secure convenient ingress and egress from said public streets to the front and rear entrances of Tenant's buildings for the purposes of receiving and delivering fixtures, merchandise and other property. Such driveway shall be of sufficient width to permit the passage, unloading, and if necessary, the turning around of trailer trucks and other commercial vehicles.
24. Landlord warrants as a consideration for Tenant entering into this lease it will initially provide [deleting "and will maintain, for the period of this lease and any extension thereof"] ingress and egress facilities of the adjoining public streets and highways in the number and substantially in the locations depicted in Exhibit "B", subject to unavoidable temporary closings or temporary relocations necessitated by public authority or other circumstances beyond Landlord's control.
KPW contends that under the amended lease it is not required to maintain the portions of the parking lot located at the rear and side of the K-Mart store, the area in front of the adjoining grocery store, or the driveways. However, we find the amendments give rise to several ambiguities which require interpretation.
Contracts must be construed in such a way as to lead to logical conclusions and to give effect to the obvious intentions of the parties. They must be interpreted in a common-sense fashion, according to the words of the contract their common and usual significance. See former C.C. Art. 1946 (current Art. 2047). A cardinal rule in the construction of contracts is that the contract must be viewed as a whole and, if possible, practical effect given to all its *1183 parts, according to each the sense that results from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as surplusage. See former C.C. Art. 1955 (current Art. 2050). Lambert v. Maryland Casualty Co., 418 So.2d 553 (La.1982).
The original lease appears to be a standard S.S. Kresge lease. However, the amendment in question which gives rise to ambiguities was apparently prepared by Clark as the lessor. Ambiguous phrases in a contract are construed against the party who prepared the contract. Huard's Inc. v. Southern States Management, 450 So. 2d 36 (La.App. 3rd Cir.1984). Any ambiguity in a contract of lease must be interpreted in favor of the lessee. Beebe v. Schmitt, 308 So.2d 887 (La.App. 2d Cir. 1975). Any doubt regarding intentions of parties to a lease, arising from uncertain terms of the contract, will be construed in favor of the lessee. Riverside Realty Company v. National Food Stores of Louisiana, Inc., 174 So.2d 229 (La.App. 4th Cir.1965), writ refused 247 La. 1037, 175 So.2d 647 (1965).
It is well settled in Louisiana jurisprudence that in interpreting the terms of a contract, the intention of the parties is the law of the case. Furthermore, in interpreting a lease contract, the court may consider all pertinent facts, including the interpretation given the contract by the parties themselves. Hebert v. Valenti, 235 So.2d 193 (La.App. 4th Cir.1970). One of the best ways to determine what the parties intended in a contract is the method in which the contract is performed, particularly if done consistently over and over again for a period of many years. Gamble v. D. W. Jessen & Associates, 509 So.2d 1041 (La.App. 3rd Cir.1987), writ denied 514 So.2d 454 (La. 1987).
We construe the amendment as relieving the lessor of maintaining the ingress and egress driveways only. We believe that such a limited interpretation is warranted in view of the provisions of paragraph 15 of the lease and the actions of the parties following the amendment.
Paragraph 15 of the lease provides for maintenance of the entire parking lot without limitations, including the area to the rear of the store. We note that neither Clark or KPW as lessor ever questioned the scope of its obligation under the lease to repair the entire parking lot. We further note that after the execution of the amendment, K-Mart continued to inform Clark or problems with the rear service drive and Clark continued to maintain this area. Even after the sale to KPW, Clark itself agreed to repair the parking areas behind and on the side of the building. Consequently, we conclude that the parties intended for the lease maintenance clause of paragraph 15 of the lease to control and obligate the lessor to make repairs to the rear service area.
Exhibit "B" of the lease shows the areas of ingress and egress to be only small portions of the parking lot. We believe these areas involve only the pavement immediately adjacent to the street and highway. As such, they are minimal and appear to account for only a very small portion of the total work which K-Mart was required to perform.
Contrary to KPW's contentions, we further find that K-Mart did not abuse its right of self-help, which was fully authorized under the lease. The lease specifically allowed K-Mart to take action in the face of the lessor's failure to fulfill its obligations. Even though K-Mart placed KPW in default in May, 1982, negotiations between the parties continued for almost a year before K-Mart felt it could no longer wait and was forced to proceed with awarding the contract for the repair of the parking lot.
As early as March, 1979, KPW was aware that repairing the parking lot would entail more than merely filling potholes. Reports by engineers hired by KPW alerted KPW to the necessity of performing more extensive repairs. Yet, KPW continued to resort to piecemeal and stop-gap repairs, conduct which, over time, obviously led to a worsening of the lot's condition.
KPW's own expert witness, Dr. Hall, testified that Mr. Griswold's method of remedying *1184 the problem was not the best alternative, obviously recognizing that there may be several solutions to the problem. He testified that he would have repaired the potholes and put a two-inch overlay of asphaltic material. However, Dr. Hall admitted that reasonable professionals could differ in their judgments and approaches to such problems. He also conceded that Mr. Griswold had done nothing imprudent or unprofessional in his resolution of the problem. In fact, Dr. Hall said he might go so far as to say that Mr. Griswold had generated an "excellent pavement", which could last up to fifteen years with proper maintenance. Although KPW in its brief brands the fabric "Petromat", utilized by Mr. Griswold in his pavement design, as a "highly experimental substance", we observe that Dr. Hall, on cross-examination, withdrew any reservations he had expressed against the use of the material. After seeing a sample of the Petromat used by Mr. Griswold, he concluded that it was different from the material with which he was familiar and about which he had testified. Dr. Hall also conceded that LETCO, which had recommended more drastic repairs than an overlay as early as 1979, was a well-established company.
The record fails to demonstrate that Mr. Griswold's recommendations resulted in excessive work. Nor did the trial court err in finding the costs reasonable.
This assignment of error is meritless.

ASSIGNMENT OF ERROR NO. 3
KPW argues that the trial court erred in not rendering judgment in its favor for the amount of the rentals withheld, or, alternatively, for the amount K-Mart spent which was excessive.
The lease provisions clearly gave K-Mart the right to use their rentals owed to KPW to pay for the work it was forced to have done on the parking lot because of KPW's failure to act. In compliance with the lease, K-Mart placed KPW in default. It then allowed almost a year to elapse between the issuance of the letter of default and its awarding of the contract for repairs. As discussed above, the repairs which were performed were necessary and were not excessive.
The trial court properly rendered judgment in KPW's favor for the amount of interest which K-Mart overwithheld, along with the cost of striping the lot, which was K-Mart's responsibility under the lease. We find no evidence in the record supporting a conclusion that these sums were withheld in anything other than good faith.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 4
KPW asserts in its fourth assignment of error that the trial court erred in applying the doctrine of "judicial control." It argues that judicial control is an affirmative defense which should have been specifically pled by K-Mart. Thus, KPW claims K-Mart should be evicted for non-payment of rent because it withheld more than $40,000.00 in rental payments.
Even though LSA-C.C. Art. 2712 provides that a lessee may be evicted for failure to pay rentals timely, the jurisprudence holds that abrogation of leases is not favored in Louisiana law. Tullier v. Tanson Enterprises, Inc., 359 So.2d 654 (La.App. 1st Cir.1978), reversed on other grounds, 367 So.2d 773 (La.1979).
Although a lessor may ordinarly dissolve a lease for failure of the lessee to pay rentals timely, this right is subject to judicial control according to the circumstances. Atkinson v. Richeson, 393 So.2d 801 (La.App. 2d Cir.1981). Louisiana courts, on the basis of equity, are vested with discretion, under some circumstances, to decline to grant the lessor cancellation of the lease. Housing Authority of City of Lake Charles v. Minor, 355 So.2d 271 (La.App. 3rd Cir.1977), writ refused 355 So.2d 1323 (La.1978).
In Brewer v. Forest Gravel Co., 172 La. 828, 135 So. 372 (1931), the Supreme Court refused to cancel a lease for non-payment of a portion of the rent. The court found that the lessee did not arbitrarily refuse to pay but made an error in good faith by refusing to pay more than he believed was due from him.
*1185 Such is the case here. The evidence in this record establishes that although K-Mart withheld too much rent to pay the amount of the construction contract on the parking lot, its action in doing so was through error and was in good faith. K-Mart, upon discovering the error, put the money in the registry of the court and requested that a judgment be rendered against it and in favor of KPW in that amount.
KPW also argues that K-Mart should have specially pled the doctrine of "judicial control" as an affirmative defense. However, we note that in K-Mart's "answer and affirmative defenses," it recited its assertions that, under the lease, it was entitled to withhold rental when the landlord failed to act. Obviously, K-Mart was asserting its good faith execution of its rights under the lease. This allegation was sufficient to allow the trial court to utilize its well-established discretion in applying the doctrine of judicial control.
This assignment of error is without merit.

ASSIGNMENT NO. 5
In its fifth and final assignment of error, KPW claims that the trial court erred in ordering it to repair the areas of the parking lot not repaired or reconstructed by K-Mart in order to bring the lot into compliance with the lease provisions of Paragraph 15. KPW argues that the lease amendment relieved it of any obligations to provide a specific number of parking spaces or a parking lot of any specific size. It asserts that, at most, KPW should only be required to maintain that portion of the lot which K-Mart itself determined was needed for its business purposes when it reconstructed part of the lot.
The lease clearly requires KPW to maintain the entirety of the parking lot, except areas of ingress and egress, as previously discussed. Paragraph 15 of the lease requires the parking lot to be maintained and it is the landlord's obligation to maintain it "in a safe, sightly, and serviceable condition, free of chuckholes, fissures and cracks."
Additionally, Mr. Clisham testified that Bossier City ordinances required that 545 adequate parking spaces be provided on this property. He estimated that the restored pavement only provided between 350 to 400 parking spaces. At the very least, the additional repairs which are to be undertaken must bring the parking lot into compliance with the zoning ordinances decreeing the size and number of parking spaces required on the property.
The evidence presented at trial, particularly the testimony of Mr. Clisham, established that after K-Mart's repairs, the remaining portions of the lot were in differing degrees of decay. The provisions of the judgment ordering KPW to repair these areas and providing that, in default thereof, K-Mart was entitled to proceed with the repairs and withhold rentals, was in compliance with the lease. As the lease is the law between the parties, we find the judgment is correct.
This assignment of error is also without merit.

CONCLUSION
Having found that KPW's assignments of error are without merit, we affirm the judgment of the trial court. Costs are assessed against KPW.
AFFIRMED.
NOTES
[1] The tenant certification was issued to a company called Penntax Properties, Inc. Clark Development sold the property in question to Penntax Properties, Inc., which, in turn, conveyed it to KPW in April, 1979.