666 So.2d 1312 (1996)
COMMERCIAL NATIONAL BANK
v.
W. Kirby ROWE, Jr., et al.
No. 27800-CA.
Court of Appeal of Louisiana, Second Circuit.
January 24, 1996.
Rehearing Denied February 22, 1996.
*1313 Schober, Reynolds & Antee by Kenneth R. Antee, Jr., Shreveport, for Defendants-Appellants.
Cook, Yancey, King & Galloway by Curtis R. Shelton, Shreveport, for Plaintiff-Appellee.
Before NORRIS, HIGHTOWER and BROWN, JJ.
NORRIS, Judge.
Five guarantors ("the Templetons"[1]) of an industrial development bond issue appeal a *1314 district court judgment holding them liable to the full extent of their guaranties. The plaintiff is Commercial National Bank ("CNB"), the indenture trustee of the bonds. For the reasons expressed, we affirm.

Factual background
In 1979 a group of investors formed a partnership called United Building Company ("UBC") for the purpose of buying and renovating the United Mercantile Bank building at 509 Market Street in Shreveport. One of the partners in UBC was another partnership called WMT 1981 Real Estate Venture ("WMT 1981"). The latter partnership consisted of six members of the Templeton family: William M. Templeton, who served as the family's financial advisor; his parents, J.C. and Ora Murphy Templeton; and his brother and sisters, Ben A. Templeton, Sarah T. Willett and Susan T. O'Brien. In September 1981, WMT 1981 owned a 28% interest in UBC.
Also in September 1981 UBC obtained financing through a bond issue of $4.62 million by the Industrial Development Board of Caddo Parish. In order to repay the bonds, the Board bought the property from, and leased it back to, UBC with monthly rental payments sufficient to repay the bonds. The Board made CNB indenture trustee of the bonds.
For additional security, CNB required every partner in UBC (except WMT 1981) to sign a guaranty agreement whereby the guarantor would be personally and unconditionally liable, in the event of UBC's default, for 150% of his equity ownership in the partnership. The guaranty agreement provides, in § 2.1, that each guarantor "unconditionally and irrevocably" guarantees the payment of principal and interest to the trustee for the benefit of the bondholders, that all payments under the guaranty shall be made "in lawful money of the United States of America," and that the guarantors' obligation is "several but not joint[.]" The guaranty agreement also provides, in § 2.2, that the guarantor's obligation shall not be affected, modified or impaired by the "waiver, surrender, compromise, settlement, discharge, release or termination of any or all of the [guaranteed obligations] or of payment" thereof. The guaranty finally provided, in § 2.4, that the guarantor was entitled to no "set-off, counterclaim, reduction or diminution of any obligation" other than by performance of the guaranty obligation. Although the Templetons were not direct partners in UBC, they were required to sign the guaranty as though they were. A total of 21 guarantors appear on Exhibit "A" to the guarantee agreement. For each of the Templetons, the stated maximum liability was $323,400.00.
Apparently, for several years UBC's tenants in the renovated United Mercantile Bank building paid sufficient rent for UBC to meet its own rent obligation to CNB and for CNB to pay the bonds' annual principal and semiannual interest maturities.
On April 8, 1987, WMT 1981 assigned all its interest in UBC to an entity called Templeton Energy Inc. Under the assignment, Templeton Energy Inc. agreed to assume "all of the liabilities, present and contingent" of five of the WMT 1981 partners[2] under the guaranty agreement. The assignment, however, was signed only by William Templeton as "managing venturer" of WMT 1981, and not by the individual guarantors.
Although the time frame and the corporate mechanism are not clear from the record, Templeton Energy Inc. was a corporate predecessor of a company called TGX, a Delaware corporation and oil company which, according to William Templeton, occupied five floors in the United Mercantile Bank building. William Templeton actually testified that in 1987, WMT 1981 sold its interest in UBC directly to TGX. R.p. 1337. Regardless, it was WMT 1981's intent to put TGX in WMT 1981's place as a partner in UBC and to substitute TGX as guarantor in lieu of the Templetons.
*1315 CNB's trust officer, Ms. Trichel, testified that in 1987 she received a request to release the Templetons from their guaranties and to put TGX in their place. She also testified, however, that under the bond trust indenture, a substitution of guarantors required approval by 100% of the bondholders.[3] She testified that after proper notice, six percent of the outstanding bondholders voted "no" to the substitution or refused to vote without additional financial statements from the Templetons, which were requested but never provided.[4] Ms. Trichel testified that despite the assignment to Templeton Energy Inc. or TGX, the individual Templetons were still guarantors as far as CNB was concerned.
In February 1990, TGX filed for Chapter 11 reorganization and failed to make its rent payment to UBC. UBC was therefore unable to make its March 1, 1990 rent payment to CNB, thus placing UBC in default of the bond obligation. CNB notified its guarantors, but none of them paid.

Procedural history
CNB brought this suit against the Templetons and some of the other guarantors in April 1991; by amended petition, ultimately 24 defendants were joined. CNB sought each guarantor's "maximum liability" as listed on Exhibit "A" to the guaranty agreement. After voluminous filings and motions, by mid-1993 CNB had dismissed all other guarantors except the five Templetons. Ms. Trichel testified that the others were let out for substantially less than their maximum liability. She also testified that after default on the bond indenture, only a majority vote of the bondholders was required to alter security.[5]
CNB's position in the instant case was that TGX did not assume the Templetons' guaranty obligation; however, in TGX's bankruptcy case, CNB filed a proof of claim urging that TGX was indeed a guarantor on the Industrial Revenue Bond issue, having assumed the obligation in April 1987. R.p. 842. By memorandum opinion and order of September 24, 1991, however, the bankruptcy court refused to hold TGX to the Templetons' guaranties. R.pp. 340-351. The bankruptcy court also held, however, that as successor to WMT 1981's interest in UBC partnership, TGX was liable for its virile share of UBC's rental debt to CNB. The latter claim was stipulated at $1,252,058. R.p. 1171.
In January 1992 the bankruptcy court confirmed a reorganization plan for TGX. Under the plan, TGX was to pay off CNB's claim by issuing 125,205 shares of TGX Preferred Senior Stock at a stated value of $10.00 per share. Ms. Trichel admitted that she took no immediate action to obtain the stock certificate; she did not do so until 14 months later, in October 1993. She further testified that TGX stock is not traded on the open market. Over a hearsay objection, she added that CNB's investment department had found the stock had no actual value. She did not know if the stock had any value 14 months earlier.
She finally testified that as of the date of trial, the bondholders were due principal of $989,464.68 and interest of $871,369.91, for a total of $1,860,834.59. R.p. 1313.[6] The Templetons' maximum liability on the guaranty totaled $1,617,000.00.
In a written ruling, the district court alluded to a sense of "natural justice" in the Templetons' favor as every other guarantor had been discharged at a discount. However, *1316 the court was constrained to find the Templetons' defenses as "providing no authority in our Civil Code or jurisprudence which would allow the Court to sustain Defendants' arguments, either for a release or a reduction." The court specifically found that the bondholders had refused to consent to the release of the Templetons as guarantors and TGX's substitution in their place; that the Templetons were not due a credit or release for the stock that CNB received from TGX in the bankruptcy case; that the guarantors' obligations were absolute, unconditional and in force until the entire principal, premium (if any) and interest on the bonds was paid; that no set-off, counterclaim, reduction or diminution applied; that the Templetons were several obligors, not joint; and that they were liable for the amount stated in the guaranty agreement. Judgment to this effect was rendered on December 13, 1994.
The Templetons have appealed devolutively, advancing six assignments of error which present four issues.

Discussion: Solidarity of the Templetons and TGX
By their first and second assignments, the Templetons urge the district court erred in not finding that the individual Templetons and TGX were solidary obligors and in not giving the Templetons credit for the payment made by TGX. The argument is based on La.C.C. art. 1821, which provides:
An obligor [here, the Templetons] and a third party [TGX] may agree to an assumption by the latter of an obligation of the former. To be enforceable by the obligee [CNB] against the third person, the agreement must be in writing. * * *
The unreleased obligor [the Templetons] remains solidarily bound with the third person [TGX]. (emphasis added)
Thus the Templetons argue that they, as original debtors, are solidarily liable with the assuming debtor, TGX, for the assumed debt. With their solidarity established, they further argue that TGX's payment of 125,205 shares of TGX Preferred Senior Stock with a stated value of $10.00 per share was performance by a solidary obligor; and TGX's performance relieves the individual Templetons to the extent of the performance. La.C.C. art. 1794; Sencore Inc. v. Boes Iron Works, 562 So.2d 1154 (La.App. 4th Cir.1990). In light of TGX's stock transfer, the Templetons claim a credit of $250,411.60 each on their guaranty.
Solidarity of obligation cannot be presumed; a solidary obligation arises from a clear expression of the parties' intent or from the law. La.C.C. art. 1796. The Templetons did not satisfy the writing requirement of art. 1821 in that they executed neither any assignment to TGX nor any special mandate to William Templeton authorizing him to bind them individually. Indeed, William Templeton in his capacity as managing venturer for WMT 1981 executed the assignment whereby Templeton Energy (or TGX) purported to assume the guarantors' liability. William Templeton unquestionably could act as mandatary for the partnership, La. C.C. art. 2814, but there was no written authority for him to bind the other individual partners. A mandate may be written or oral, La.C.C. art. 2992, but in light of the special writing requirement of art. 1821 a written mandate was needed. The instant record also contains no evidence of an oral mandate from the defendants to William Templeton; however, even if such evidence had been adduced, parol evidence is inadmissible to establish the promise to pay the debt of a third person. La.C.C. art. 1847. The district court was certainly entitled to find inadequate evidence, under art. 1821, of the consent of each party. Because solidarity between the Templetons and TGX on the guaranty was not proved, the claim for credit under art. 1794 lacks merit.

Inadmissible hearsay
By their third assignment the Templetons urge the district court erred in allowing Ms. Trichel to testify as to inadmissible hearsay from another officer of CNB regarding the marketability of TGX Senior Preferred stock. On direct examination Ms. Trichel testified that a Mr. Cluck, an officer at TGX, and another officer in CNB's investment department both advised her that the TGX stock had no value. The Templetons objected to this as hearsay; the court replied *1317 that it would consider her an expert who was entitled to relate the information she obtained. The Templetons then objected that Ms. Trichel was never tendered as an expert in the valuation of securities. The court overruled the objections. R.pp. 1297-1298. The Templetons argue on appeal that without her testimony, there was no evidence on which the court could base its finding that the TGX Senior Preferred stock was valueless. On the contrary, they argue, TGX's Chapter 11 reorganization gave CNB 125,205 shares with a stated value of $10.00 per share to satisfy a $1,252,058.00 debt; this is the only competent record evidence of the stock's value, and the court was bound to accept it.
On cross examination, the Templetons also asked Ms. Trichel if she had received "something of value" to vote for the reorganization plan. She replied that she has "not been able to determine that it [the stock] has a value." R.p. 1308.
Strictly speaking, Ms. Trichel's recital of statements by Mr. Cluck at TGX and an unnamed investment officer at CNB was hearsay and inadmissible. La.C.Ev. arts. 801 C, 802. However, the witness is permitted to testify to matters within her personal knowledge. La.C.Ev. art. 602. The substance of her direct and cross examination is that she was not able to get anything for the stock. The trial court was entitled to consider whether Ms. Trichel, a certified corporate trust specialist and trust officer at CNB for over 10 years, had sufficient personal knowledge and experience to investigate the value of a security and to testify accordingly.
Moreover, the party who alleges that an obligation has been extinguished must prove the facts or acts giving rise to the extinction. La.C.C. art. 1831; La.C.C.P. art. 1005; American Nat'l Bank of Cheyenne, Wyoming v. Gamble, 324 So.2d 16 (La.App. 2d Cir.1975). Thus the burden rested with the Templetons to prove their obligation had been discharged pursuant to § 2.2 of the Guaranty Agreement. William Templeton testified that according to an audited financial statement of December 31, 1986 (not introduced in evidence), TGX had a stockholders' equity or net worth in excess of $95 million. R.p. 1340. He did not, however, testify as to the stock's value either in 1986 or in 1992, when it was issued to CNB under the reorganization plan. There is no presumption that stock was worth its "book value" or par value. Virginia v. West Virginia, 238 U.S. 202, 215, 35 S.Ct. 795, 801, 59 L.Ed. 1272 (1914); Annotation, "Presumption as to value of corporate stock or bonds," 6 A.L.R.2d 189 (1949). The record does not support the argument that the Templetons were entitled to a credit for the indenture trustee's receipt of such stock. Finally, there was no evidence to show that the payment of this stock would satisfy the provision of the Guaranty Agreement requiring payment in "lawful money of the United States of America."
In short, despite the ruling on the hearsay objection, the district court was not plainly wrong to find the Templetons did not prove that the TGX Senior Preferred Stock paid to CNB under the reorganization plan had any value, amounted to performance of the guaranty obligation, or affected CNB's rights under the guaranty agreement in any way. This assignment lacks merit.

Joint obligation of the Templetons and other guarantors
By their fourth and fifth assignments, the Templetons urge that their co-guarantors were actually joint obligors and CNB's release of three of them[7] released the Templetons from their guaranty obligation. The argument is premised on former La.C.C. art. 2080 (1870),[8] which provided that "[w]hen several persons join in the same contract to do the same thing, it produces a joint obligation on the part of the obligors." According to the Templetons, they and the other guarantors promised to do the same thing, at least to the extent that each guarantor's "maximum liability" exceeded 100% of his ownership (virile share) in UBC. The Templetons *1318 concede that the Guaranty Agreement itself, in § 2.1, creates a "several but not joint obligation of each of the undersigned Guarantors," but contend that the court may disregard the self-serving characterization of the contract and apply its true intent. In support they cite Diggs v. Hood, 772 F.2d 190 (5th Cir.1985); Perkins v. Scaffolding Rental & Erection Serv. Inc., 568 So.2d 549 (La.1990); Lanier v. Capital Resources Group Inc., 563 So.2d 557 (La.App. 4th Cir.1990); and Shell Petroleum Corp. v. Calcasieu Real Estate & Oil Co., 185 La. 751, 170 So. 785 (1936). They further contend that when CNB released the three named guarantors, this impaired the Templetons' right of contribution against them in an amount that greatly exceeds the Templetons' joint obligation. Former La.C.C. art. 2161(3) (1870).[9]
Parties are free to contract for any object that is lawful, possible, and determined or determinable. La.C.C. art. 1971. In other words, the contract is the law between the parties. Fullerton v. Scarecrow Club Inc., 440 So.2d 945 (La.App. 2d Cir. 1983). A contract of guaranty is equivalent to a contract of suretyship and the two terms are used interchangeably. Bank of Coushatta v. Patrick, 503 So.2d 1061 (La.App. 2d Cir.), writ denied 506 So.2d 1231 (1987). Suretyship may be qualified, conditioned or limited in any lawful manner. La.C.C. art. 3040. Professor Litvinoff has explained:
The Louisiana law of suretyship does not prevent two or more persons from making an agreement with a creditor whereby, among themselves and vis-à-vis the creditor, those persons become several sureties or obligors, each of them liable for a stated amount independently of the others, in which case a remission that the creditor might grant to one of such sureties would not affect the obligations of the others to any extent.
Litvinoff, 5 La. Civil Law Treatise (Obligations), § 18.12 (West, 1992) (footnote omitted).
The instant Guaranty Agreement specifically makes each guarantor's obligation "several but not joint." Further, it recognizes no distinction between the guarantor's virile share of the underlying debt and the additional 50% that created each one's "maximum liability." In short, a plain reading of this contract forecloses the Templetons from claiming any benefit from the fact that CNB may have released other guarantors for less than their maximum liability.
We have closely reviewed the authorities cited by the Templetons in their effort to vary the strict terms of the agreement. The cases of Diggs and Perkins, supra, both are personal injury suits involving joint tortfeasors whose liability was, under the law in effect at the time, solidary. The courts were not called upon to interpret a contract. In the Lanier case, the defendants were found solidarily liable with the plaintiff for the balance of a $40,000 loan which had been made to extend an option to purchase. The published opinion does not state that there was any written agreement with respect to this $40,000 loan, only an understanding that each was to render the same performance. The Shell Petroleum case, supra, actually does interpret an ambiguous mineral lease to be a joint lease between husband and wife rather than severable. However, the lease nowhere stated that the obligation was severable. We agree that an ambiguous guaranty agreement can be interpreted to create joint obligations. See, e.g., Security First Nat'l Bank v. Richards, 584 So.2d 1174 (La.App. 3d Cir.1991). However, as Professor Litvinoff shows, just because each surety is bound to guarantee the same underlying obligation, this does not make them joint or solidary obligors. Teutonia Nat'l Bank v. Wagner, 33 La.Ann. 732 (1881).
The instant contract is not ambiguous and the cited cases do not provide authority for declaring the Templetons joint obligors with the other guarantors. Consequently CNB's release of three other guarantors had no effect on the Templetons' obligations. These assignments lack merit.

Equitable estoppel
By their sixth assignment the Templetons urge the district court erred in not finding that CNB was estopped from pursuing them on the guaranty agreement. In support they cite William Templeton's testimony *1319 that in 1986 or 1987, when WMT 1981 was assigning its interest in UBC to TGX, he asked Ms. Trichel if CNB would release the Templetons from their guaranties in exchange for TGX's guaranty. He further testified that he advised her that TGX's financial position was far better than the Templetons'; and he gave her TGX's four latest annual financial statements, all audited, showing stockholder equity of over $95 million. He added that Ms. Trichel replied she "couldn't imagine there would be a problem" with substituting the guaranties, if the financial statements were accurate. Based on this representation, William Templeton believed his family members had been released; Ms. Trichel never told him otherwise. J.C. and Ben Templeton testified they had no direct communications with CNB regarding the proposed substitution, but that William told them it would be "no problem." Mrs. Willett also had no written or oral communications with the trustee. R.p. 1185. Ben Templeton stated, however, that he did not believe he had been released; Mrs. O'Brien testified by stipulation that no one represented to her that she had been released. R.pp. 1329, 1189.
The Templetons further argue that while Ms. Trichel did not recall telling William Templeton that the substitution would be "no problem," she said it would have been "logical to release them" if their representations were correct.
All this testimony, it is argued, satisfies the requirements for equitable estoppel: (1) a representation by conduct or word by the person sought to be estopped, (2) justifiable reliance thereon; and (3) a change in position because of that reliance to the detriment of the person asserting estoppel. Chevron USA Inc. v. Traillour Oil Co., 987 F.2d 1138 (5th Cir.1993); Knippers v. Lambard, 620 So.2d 1368 (La.App. 2d Cir.), writ denied 629 So.2d 1169 (1993).
Equitable estoppel is a doctrine of last resort; it is not favored by Louisiana courts, and will be applied only when justice so demands. Robbins Tire & Rubber Co. v. Winnfield Retread Inc., 577 So.2d 1189 (La. App. 2d Cir.1991), and citations therein. The party invoking estoppel bears the burden of proving the facts on which it is founded. KPW Associates v. S.S. Kresge Co., 535 So.2d 1173 (La.App. 2d Cir.1988), writ denied 537 So.2d 1167 (1989). Equitable considerations and estoppel cannot prevail in conflict with the positive law. La. C.C. art. 4; Palermo Land Co. v. Planning Comm'n, 561 So.2d 482 (La.1990). The district court's factual findings are entitled to discretion and will not be disturbed unless they are plainly wrong or manifestly erroneous. Stobart v. State, through DOTD, 617 So.2d 880 (La.1993).
None of the guarantors testified that they had direct communications with Ms. Trichel about the proposed substitution. Only William Templeton discussed the matter with her; at best, the other defendants' testimony indicates that William may have led some of them to believe they might be released. The guarantors cannot claim to have justifiably relied on a communication that never occurred. As for the final requirement of estoppel, change in position, the defendants' showing is unpersuasive. In short, the grounds for estoppel are not clearly shown, and the district court was not plainly wrong to decline to render judgment on that basis. Stobart v. State, supra; Knippers v. Lambard, supra.
Moreover, we are unable to apply estoppel in the presence of an unambiguous contract and pertinent statutory law. Robbins Tire & Rubber Co. v. Winnfield Retread Inc., supra. This assignment of error lacks merit.

Conclusion
For the reasons expressed, we affirm the judgment of the district court. Costs of appeal are assessed to the appellants, J.C. Templeton, Ora Murphy Templeton, Ben A. Templeton, Sarah T. Willett and Susan T. O'Brien.
AFFIRMED.

APPLICATION FOR REHEARING
Before MARVIN, NORRIS, HIGHTOWER, BROWN and GASKINS, JJ.
Rehearing denied.
NOTES
[1] The appellants are J.C. and Ora Murphy Templeton, and their children, Ben A. Templeton, Sarah T. Willett and Susan T. O'Brien. Another of the original guarantors, William M. Templeton, was not named a defendant because his debt was discharged in bankruptcy. R.p. 63.
[2] The five were the defendants herein. The assignment did not purport to transfer William Templeton's guaranty obligation to Templeton Energy Inc. R.pp. 838-841.
[3] The indenture, ¶ 1302, prohibits the trustee from making any amendment of the Guaranty Agreement "that would adversely affect the rights of the Trustee and the holders of the Bonds * * * without the consent of the holder of each Bond then outstanding that would be adversely affected by such amendment, change or modification." (emphasis added)
[4] She also testified that 36% of the bondholders voted "yes," and the remainder (including CNB as a bondholder) did not vote. R.pp. 1294-1295.
[5] The bond indenture, ¶ 1005, authorizes a majority of the bondholders, after default, to "direct the time, method and place of conducting all proceedings to be taken in connection with the enforcement of the terms and conditions of this Indenture[.]" This contrasts with the unanimous approval needed to alter the guaranty prior to default.
[6] The Joint Stipulation of Facts had stated the amount of interest as $847,460.15, for a total balance due of $1,836,924.83. R.p. 1179.
[7] In brief they specifically cite guarantors W. Kirby Rowe Jr., E.H. Railsback and Alvin Childs, whose guaranties totaled $2,356,200.00, but were released for a total of $601,628.00. Br., 13.
[8] Repealed by La.Acts 1984, No. 331, § 1, effective January 1, 1985.
[9] Repealed by La.Acts 1984, No. 331, § 1, effective January 1, 1985.