MAX N. TOBIAS, JR., Judge.
|,First Bank & Trust (“FBT”), the plain-tiffiappellant, filed the instant appeal after obtaining a deficiency judgment against the defendants/appellees/eross-appellants, Todd J. Tedesco (“Tedesco”) and Todd Tedesco Investments, L.L.C. (“TTI”). After reviewing the record and applicable law, we affirm in part, amend in part, and render judgment as amended.
In July 2005, TTI entered into a multiple indebtedness mortgage on immovable property located at 7515 St. Charles Avenue, New Orleans, Louisiana. The mortgage was used as security for a promissory note dated 26 March 2009. When the defendants defaulted on the obligation, FBT accelerated the balance owed on the promissory note and demanded payment. When payment was not forthcoming, FBT filed a petition for executory process in the parish of New Orleans; the collateral was seized and sold with benefit of appraisal on 18 June 2010 for $696,666.67 at a sheriffs sale pursuant to a writ of seizure and sale. Right and title on the property was transferred to FBT on 22 July 2010, for they bid in the property at the sheriffs sale.
|⅞(⅛ 12 August 2010, FBT filed a petition for deficiency judgment against Ted-esco and TTI for the deficiency balance on a promissory note dated 26 March 2009, in the principal amount $1,677,909.35, loan number 100205787, secured by that multiple indebtedness mortgage. The loan was made pursuant to a business loan agreement, also dated 26 March 2009, which names Tedesco as the guarantor on the loan.
FBT calculated its deficiency judgment against the defendants: (a) the principal amount of $1,609,474.90; (b) interest in the amount of $160,219.63 through 17 June 2010, together with interest at a default rate of 21% per annum from 18 June 2010, until paid; (c) late fees in the amount of $2,000.00; (d) 25% of principal and interest as attorneys’ fees; (e) $64,980.00 in property taxes; (f) $20,558.25 in sheriffs costs; and (g) all other costs of the proceedings, all subject to a credit of $696,666.67.
*656 Sal Runco (“Runco”), recovery specialist for FBT with 34 years’ experience in the banking industry, calculated the deficiency due as of the date of trial, 12 January 2012, to be $1,258,606.65. Interest was calculated on the promissory note at the rate of 8% per annum. Included in the deficiency amount were the sheriffs costs and commissions of $28,088.85, and attorney’s fees of $33,172.00. Runco explained that the 26 March 2009 note, loan number 100205787, was a repackaging and renewal of three previous TTI loans, numbers 100149284, 100134780, and 100200702; no new money was loaned by FBT to TTI.
| ¡¡Runco testified that Tedesco executed a commercial guaranty for personal liability to FBT on 25 June 2008. He testified that the boxes at the top of the commercial guaranty referencing loan, date, loan number, and amounts were blank because it was a blanket guaranty; it was not tied to a specific note. The terms of the continuing guaranty provide that Tedesco was personally liable for any and all amounts borrowed by TTI in the present or in the future regardless of the amount. Runco reiterated that the guaranty applied to all present and future loans from FBT to TTI.
Runco was directed to page 2 of the guaranty where a reference is made to loan number 100200702, one of the three loans repackaged and refinanced in the 26 March 2009 loan. He testified that the loan number on the second page of the guaranty is a reference to the fact that the guaranty was created at the same time as loan number 100200702. Runco further explained that to recover under the guaranty, he looks to the four corners of the document to determine if: (1) it is continuing and there is no expiration date; (2) the guaranty amount is unlimited; (3) it applies to present and any future debt incurred; and (4) at the top of the guaranty there is the language that “the boxes above are for lender’s use only and do not limit the applicability of this document to any particular loan or item.”
Desiree Harrison (“Harrison”), Vice President of FBT, testified regarding her personal knowledge in closing the loan of 26 March 2009 with Tedesco and TTI. She handles workouts and restructures on the larger commercial loans. In this case, she had been unable to locate the commercial guaranty but remembered |/Tedesco signing it on 26 March 2009. She stated that it was her practice to have a new continuing guaranty signed with each new loan, although most of the other FBT officers did not do the same. Harrison testified that the bank had four or five unlimited continuing guaranties previously signed by Tedesco. She further stated that the 25 June 2008 guaranty meant that Tedes-co, as guarantor, had an unlimited continuing guaranty liability for any loan made in the future to TTI, including the 26 March 2009 loan, without the execution of any additional continuing guaranty.
Harrison stated that the loan number reference on the second page of the continuing guaranty is 100200702. She identified that loan number as one that was consolidated into the 26 March 2009 loan; the amount from that loan was $265,760.85.
Under cross examination, Harrison testified that she remembered Tedesco signing a new continuing guaranty when he executed the documents for loan number 100205787. However, that guaranty could not be found at the bank.
Tedesco and TTI assert[1] that TTI had business loans with FBT, one of which was *657 executed on 25 June 2008, for the loan bearing number 100200702, in the original principal amount of $540,000.00. In conjunction with that June 2008 loan, Tedesco signed a continuing guaranty on the same date bearing the same loan number.
When the housing business took a downturn, Tedesco requested his father’s (Terry Tedesco’s) financial assistance. Terry Tedesco negotiated with FBT 15whereby he agreed to pay down part of the debt and, in exchange, FBT would assign to Terry Tedesco Home Builders, LLC (“TTHB”) the 25 June 2008 note together with the collateral, immovable property on Arabella Street in New Orleans, that secured this note and, as asserted by Tedesco and TTI, the 25 June 2008 guaranty.[2]
Consequently, on 26 March 2009, TTI entered into a subsequent “business loan agreement” and signed the promissory note with FBT for the amount of $1,607,909.35, that was secured by immovable property located at 7515 St. Charles Avenue. No new guaranty was signed for this new loan.
On 30 April 2009, FBT executed a “notarial act of transfer, endorsement, assignment, and subrogation of note and related collateral,” wherein the 25 June 2008 note and the collateral securing the note were assigned to TTHB for the sum of $266,563.93. As a result, TTHB received the 25 June 2008 note itself, and the collateral property located on Arabella Street was released.
When TTI defaulted on the 26 March 2009 loan, foreclosure proceedings by means of an executory process were instituted by FBT in Orleans Parish. The immovable property securing that promissory note, 7515 St. Charles Avenue, was seized and sold for $696,666.67 at an 18 June 2010 sheriffs sale. However, according to Tedesco and TTI, the appraisal was (1) not under oath; (2) not signed; and (3) was a “drive-by appraisal,” all in violation of the Louisiana Deficiency Judgment Act.
IfiOn 12 August 2010, FBT filed a petition for deficiency judgment against the defendants based on the 26 March 2009 note executed by Tedesco, as manager of TTI. Nothing in the petition referenced any guaranty or other obligation binding Tedesco personally. In fact, no guaranty was produced until a few days before trial.
The trial court found it undisputed that Tedesco signed a personal continuing guaranty on 28 June 2008. The guaranty references loan number 100200702; this loan was one of three loans subsequently consolidated and refinanced into the package loan for $1,607,909.35 on 26 March 2009. The trial court found that the 28 June 2008 guaranty specifically states that it covers both current and future indebtedness.
The court cited the testimony of Harrison that she remembered Tedesco signing a personal guaranty on 26 March 2009. However, that guaranty was not produced. The trial court held that the parties intended that the 28 June 2008 continuing guaranty would relate only to loan number 100200702. Thus, the court found Tedesco personally liable only for that portion of the debt remaining due on loan number 100200702 when it was refinanced on 26 March 2009.
The trial court rendered judgment in favor of FBT and against Tedesco personally for $265,760.85 principal, together with $3,686.21 in sheriff’s costs, attorney’s fees of $33,172.00, and interest at a rate of 8% *658 per annum totaling $21,260.86. Further, the court rendered judgment against TTI in the amount of |7$915,374.00; the remaining sheriffs costs of $19,352.64 were assessed against FBT.
FBT appealed the judgment of the trial court, arguing that the court should have found Tedesco personally liable for the entire amount of the debt of TTI. Tedes-co and TTI filed a cross appeal, arguing that Tedesco was not personally liable for any part of the debt.
FBT has assigned two errors for review. First, it contends that the trial court erred in failing to find that Tedesco’s June 2008 guaranty was a continuing guaranty applicable to all future indebtedness on the part of TTI, including the subsequent March 2009 loan. Second, it argues that the trial court abused its discretion in assessing costs against it, the prevailing party. Because we are interpreting a contract between the parties, we begin our analysis with the language of the guaranty.
The June 2008 continuing guaranty signed by Tedesco states in pertinent part:
CONTINUING GUARANTY. THIS IS A “CONTINUING GUARANTY” UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO. LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE BORROWER’S INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR’S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS J^MAY BE A ZERO BALANCE FROM TIME TO TIME TO THE EXTENT THAT GUARANTOR IS OR MIGHT BECOME A MEMBER/OWNER OF BORROWER, GUARANTOR AGREES THAT, NOTWITHSTANDING THE PROVISIONS OF LA. R.S. 12:1320. GUARANTOR SHALL BE LIABLE UNDER THIS GUARANTY FOR THE BORROWER’S INDEBTEDNESS. [Emphasis supplied.]
The guaranty also provides that its obligations remain in full force and effect until such time as a written cancellation instrument in favor of guarantor is executed.
The guaranty further provides:
ADDITIONAL GUARANTIES. Guarantor recognizes and agrees that Guarantor may have previously granted, and may in the future grant one or more additional guaranties of Borrower’s Indebtedness and obligations in favor of lender. Should this occur, the execution of this Guaranty and any additional guarantees on Guarantor’s part will not be construed as a cancellation of this Guaranty or any of Guarantor’s additional guaranties; it being Guarantor’s full intent and agreement that all of Guarantor’s guarantees of Borrower’s Indebtedness and obligations in favor of lender, shall remain in full force and shall be cumulative in nature and effect. [Emphasis supplied.]
A contract of guaranty is equivalent to a contract of suretyship and the two terms may be used interchangeably. Bank of Coushatta v. Patrick, 503 So.2d 1061, 1068 (La.App. 2nd Cir.1987): Commercial National Bank v. Rowe, 27,800, p. 10 (La.App. 2 Cir. 1/24/96), 666 So.2d 1312, 1318. Therefore, the provisions of the civil code governing the contract of suretyship may be examined in testing whether a *659 continuing guaranty exists. Ball Marketing Enterprise v. Rainbow Tomato Co., 340 So.2d 700, 701 (La.App. 3rd Cir.1976). In Regions Bank v. Louisiana Pipe & Steel Fabricators, LLC, 11-0839, p. 4 (La.App. 1 Cir. 12/21/11), 80 So.3d 1209, 1212-13, the First Circuit stated:
^Suretyship is established upon receipt by the creditor of the writing evidencing the surety’s obligation. The creditor’s acceptance is presumed, and no notice of acceptance is required. LSA-C.C. art. 3039. An agreement to become a surety must be expressed clearly and must be construed within the limits intended by the parties to the agreement. Placid Refining Co. v. Privette, 523 So.2d 865, 867 (La.App. 1st Cir.), writ denied, 524 So.2d 748 (La.1988). Contracts of guaranty or suretyship are subject to the same rules of interpretation as contracts in general. Ferrell v. South Central Bell Telephone Co., 403 So.2d 698, 700 (La.1981).
Based on the language in the guaranty and the jurisprudence, FBT contends that the 25 June 2008 guaranty remained in full force and effect and applied to the March 2009 loan. Thus, they contend that FBT could obtain a deficiency judgment against Tedesco for the full amount of the debt, contrary to the judgment of the trial court.
Contrariwise, Tedesco and TTI contend that, despite the guaranty’s language quoted above, the refinanced portion of the 25 June 2008 note and the guaranty of that same date were transferred to TTHB pursuant to the notarial act of transfer dated 30 April 2009. Further, they contend that because no new personal guaranty was signed by Tedesco, the deficiency judgment arising from the 26 March 2009 note is the responsibility of TTI alone.
It is undisputed that FBT sold the 25 June 2008 promissory note in the original principal amount of $540,000.00 to TTHB on 30 April 2009. Also transferred to TTHB were the “assigned collateral documents,” which are defined in the act of transfer as the note and the act of multiple indebtedness mortgage dated 20 January 2005 by TTI in favor of FBT. No mention of the continuing guaranty is made in the act of transfer. The proceeds received by FBT for the note and mortgage were used to bring loan number 100200702 current; the act of |intransfer did not extinguish the entire debt on the note sold to TTHB. The remainder owed on that loan was restructured into a new business loan agreement by TTI that consolidated and refinanced loan numbers 100149284, 100137480, and 100200702. This resulted in loan number 100205787 for the principal amount of $1,607,909.35 made on 26 March 2009 and due on or about 26 March 2010.
Perhaps it was the intent of Tedesco and his father that the June 2008 continuing guaranty be transferred to TTHB in the notarial act of transfer. However, Tedes-co was not present at the trial and presented no witnesses at trial on his behalf. Therefore, we are bound by the four corners of the documents admitted into evidence at trial. We find that the June 2008 continuing guaranty remained the property of FBT.
Finding that the 2008 guaranty remained in the possession of FBT, the trial court held that the June 2008 continuing guaranty applied only to the remainder of loan number 100200702, together with interest, attorney’s fees, and sheriff’s costs. It reasoned as follows:
The balance of this loan [number 100200702] was included in a promissory note signed by Todd Tedesco Investments, L.L.C. on March 26, 2009. The purchase by Terry Tedesco in the act of transfer did not extinguish the entire debt owed by Todd Tedesco Investments, L.L.C., under loan number *660 10020070 [sic]. The question is whether Mr. Tedesco personally guaranteed the entire loan or just the balance of loan 10020070 [sic].
It is undisputed that Mr. Tedesco signed a personal guarantee on June 28, 2008. The guarantee references loan number 10020070 [sic]. It does specifically state that it covers both current and future indebtedness. Ms. Desiree Harrison, a vice-president at FBT, testified that she personally handled Mr. Tedesco’s loans. Under cross-examination, Ms. Harrison stated without question that she remembers Mr. Tedesco signing a personal guarantee on March 26, 2009. However, this promissory note [sic] was not produced. Ms. Harrison further indicated that the bank would not have back-dated the Inguarantee to June 28, 2008. She later offered that the June 28, 2008, guarantee would be applicable to the March 26, 2009 refinanced loan. Based upon the credibility of the witnesses and the documentary evidence, this court finds that the parties intended that the personal guarantee [sic] dated June 28, 2008, would be solely related to loan number 10020070 [sic]. The court also finds that FBT failed, through its own oversight, to have Mr. Tedesco sign a personal guarantee for the March 26, 2009 refinancing. Ms. Harrison did not assert that Mr. Tedes-co signed the note [sic], and it was lost. FBT did not produce a guarantee because no such guarantee [sic] existed.
We find that the trial court erred in its findings on this issue. Harrison stated that, to the best of her knowledge, she saw Tedesco sign a new continuing guaranty for the 26 March 2009 refinancing.[3] She also testified that she has customers sign new guaranties whenever a new loan is made, but many of the officers at FBT do not. In any event, she testified, as did Runco, that the guaranty dated 28 June 2008 was sufficient to hold Tedes-co personally liable for the full amount of the debt owned by TTI. This evidence was uncontroverted being the only testimony presented at trial on this issue.[4]
We are also guided by the March 2009 business loan agreement between TTI and FBT. Under “Guaranties,” the document states:
Prior to disbursement of any Loan proceeds, [the borrower] furnish executed guaranties of the Loans in favor of Lender, executed by the guarantor named below, on Lender’s forms, and in the amount and under the conditions set forth in those guaranties.
The agreement does not state that a new guaranty for this particular loan be executed, only that one or more guaranties must be executed by the guarantor in |12favor of FBT before any loan proceeds are disbursed. Based on the jurisprudence and the wording of the relevant documents, we find that the June 2008 guaranty was applicable to this loan (any other future loans) from FBT to TTI. It thusly was applicable to the 26 March 2009 refinancing.
Before addressing the issue of costs raised by FBT, we turn to the remaining assignments of error asserted by Tedesco and TTI.
Tedesco and TTI argue that FBT did not comply with the Louisiana Deficiency Judgment Act: they failed to plead *661 and prove the existence of Tedesco’s personal liability. Related to this is their next assignment of error: that the trial court erred by admitting into the evidence the June 2008 guaranty that was not previously produced by FBT. Without the guaranty, they assert, no proof of Tedesco’s personal liability exists.
In First Guaranty Bank, Hammond, Louisiana v. Baton Rouge Petroleum Center, Inc., 529 So.2d 834, 842 (La.1987), the Louisiana Supreme Court, on rehearing, set forth the requirements for deficiency judgment, as follows:
To obtain a deficiency judgment, the creditor first must affirmatively plead and prove the existence of the obligation giving rise to the debt, La.C.C. art. 1831, and the grounds of non-performance entitling him to maintain his judicial action. La.C.C. art. 1994. Further, he must aver and establish by evidence that the property was sold under the execu-tory proceeding after appraisal in accordance with the provisions of article 2723 of the Code of Civil Procedure; Gordon Finance Co. v. Chambliss, 236 So.2d 533 (La.App. 2d Cir.1970), writ denied, 256 La. 869, 239 So.2d 364 (1970); Pickering v. Kinney, 205 So.2d 199 (La.App. 2d Cir.1968); and that the proceeds received were insufficient to satisfy the balance of the performance then due. La.C.Civ.P. art. 2771; La.R.S. 13:4106; 4107. The appraisal procedures of article 2723 require that prior to the sale, the property seized must be appraised in accordance with law, and the order directing the issuance of the writ of seizure and sale must have directed that the property be sold as prayed |1sfor. Other statutory law sets forth the procedures for written notices to the debtor and seizing creditor, the appointment of appraisers, the sheriff’s appointment of an appraiser if a party neglects to do so, delivery of appraisals, oaths of appraisers, and the form of the appraisals. La. R.S. 13:4363-4365.
The debtor, on the other hand, may assert both negative and affirmative defenses against the deficiency judgment action. He may defend by demonstrating the creditor’s failure to prove one of the aforementioned elements of his case or by rebutting the existence of such an element. Additionally, the debtor may assert that an obligation is null, or that it has been modified or extinguished, but in such a case the debtor must prove the facts or acts giving rise to the nullity, modification, or extinction. La.C.C. art. 1831; La.C.Civ.P. art. 1005.
On these issues, the trial court stated:
Tedesco maintains that the first time this personal guarantee [sic] was produced by FBT was a few days prior to trial. Up to that point, Tedesco had not been provided with any evidence of his personal indebtedness. While Tedesco did identify the personal guarantee [sic] as an exhibit, he never offered it into evidence. Tedesco, who was not subpoenaed for trial by FBT, objected to the introduction of the personal guarantee [sic] as hearsay. FBT orally moved for a continuance of the trial because it had not anticipated that Mr. Tedesco would not be present to authenticate his signature. The court found that this expectation was reasonable as Mr. Ted-esco filed a reconventional demand which he would have to prove through his testimony. FBT in return objected to a “Notarial Act of Transfer, Endorsement, Assignment and Subrogation of Note and Related Collateral” dated April 30, 2009, arguing that it had not been produced timely. However, this court found that since FBT had recently produced the personal guarantee [sic], it was reasonable for Tedesco to obtain *662 any documents he deemed were relevant to defend against this late filed document. This court found that both documents were reliable and both were admitted. All other objections were reserved. The court finds that Mr. Ted-esco did not judicially confess the validity of the personal guarantee [sic] or that he personally guaranteed the entire indebtedness sought by FBT in this case.
| uThe admission of evidence is within the discretion of the trial court. Munch v. Backer, 10-1544, p. 3 (La.App. 4 Cir. 3/23/11), 63 So.3d 181, 185. We find that the trial court acted fairly and reasonably by admitting all the evidence produced by the parties after the discovery deadline. Once the guaranty was admitted, FBT proved the existence of an obligation giving rise to the debt. This assignment of error is without merit.
Finally, Tedesco and TTI have attacked the appraisal process, arguing that the Orleans Sheriff did not comply with the statutory appraisal requirements. Specifically, they contend that the appraisal by FBT was fatally defective for the following reasons: (1) the appraiser did not take an oath to make a true and just appraisal; (2) the appraiser did not sign the appraisal; (3) the appraiser did not sign the sheriffs form; and (4) the appraiser did a “drive-by” appraisal and did not inspect the inside of the property.
To preserve its right to a deficiency judgment, the creditor must act in substantial, but not necessarily flawless, compliance with the Louisiana Deficiency Judgment Act. In other words, only a fundamental or obviously prejudicial defect will bar the deficiency action. Citicorp Acceptance Co., Inc. v. Roussell, 601 So.2d 350, 354 (La.App. 1st Cir.1992); Whitney National Bank v. FWF, Inc., 93-1152, 93-1153, p. 4 (La.App. 4 Cir. 3/29/94), 635 So.2d 361, 364. A fundamental defect, as in an appraisal, necessarily entails unfairness, injustice, or prejudice to the debtor.
One whose property has been sold by executory process with benefit of appraisal may attack the appraisal of the property in the creditor’s later ordinary action for a deficiency judgment. American Bank and Trust Co. v. Price, 28,018, p. 3 (La.App. 2 Cir. 4/3/96), 688 So.2d 536, 543. Because a sale with proper 1 ^notice and with benefit of appraisal that is valid on the face of the executory process and sheriffs record is legally presumed to have been conducted as the law directs, those who assert the lack of qualifications of the appraisers bear a burden of proof that the jurisprudence has consistently said to be heavy or substantial. Ford Motor Credit Co. v. Blackwell, 295 So.2d 522, 523 (La.App. 4th Cir.1974); Calcasieu Marine National Bank v. Miller, 422 So.2d 558, 560 (La.App. 3rd Cir.1982).
A debtor’s mere supposition or argument that the appraisal is or was unfairly or unjustly prejudicial to the debtor and thus invalid, without some evidence to establish that fact, will not be deemed to satisfy the substantial burden of proof and rebut the presumption that the sale was conducted as the law directs. Whitney National Bank, supra; Calcasieu National Bank, supra; Stockman v. Money, Inc., 277 So.2d 504, 506 (La.App. 1st Cir.1973).
In its reasons for judgment, the trial court stated:
In the instant matter, there was only one piece of property to be appraised. Richard T. Kimball Jr. was appointed to appraise the property on behalf of the bank. Mr. Kimball performed two separate appraisals: one on January 8, 2010, and another on May 25, 2010. Tedesco described Mr. Kimball’s ap *663 praisals as “drive-by” appraisals tantamount to a fundamental defect for lack of minuteness. Mr. Kimball wrote in his appraisal summary report that the “features and improvements were taken from the current MLS listing,” or multiple listing service, a database that stores home information to enable appraisals. He further wrote that he “inspected the subject [property] from the street and assumes that the condition and square footage is accurate.” Mr. Kimball appraised the property in January for ONE MILLION ONE HUNDRED THOUSAND 00/100 ($1,100,-000.00) DOLLARS. His May appraised value was NINE HUNDRED AND NINETY THOUSAND 00/100 ($990,-000.00) DOLLARS. Mr. Kimball electronically signed his appraisal but he did not sign under oath. Ms. Brenda Douglas, a representative from the Orleans Parish | ^Sheriffs Office, testified that the sheriffs office appointed J.R. Richardson to appraise the property on behalf of Tedesco. Mr. Richardson did not submit a written appraisal. He appraised the property for ONE MILLION ONE HUNDRED THOUSAND 00/100 ($1,100,000.00) DOLLARS and signed the sheriffs book under oath. Ms. Douglas testified that she averaged the two appraisals to reach the refereed amount of ONE MILLION FORTY FIVE 00/100 ($1,045,000.00) DOLLARS. This court finds that Mr. Kimball’s appraisal was valid. The goal was to realize as much money from the sale as possible. Moreover, similar to the defendants in Williams, supra, Tedesco failed to offer any evidence that had Kimball inspected the interior of the Tedesco property, his appraisal would have been higher. See Williams v. Perkins-Siegen Partnership, 93-2131 (La.1995); 649 So.2d 367, 370. Interestingly, it is unknown how Tedesco’s appraiser arrived at his appraised value as his appraisal was not admitted into evidence. The court finds that the goal of trying to get as much money as possible for this property was accomplished in this case. As such, the court finds that Tedesco was not prejudiced by Kim-ball’s appraisal.
The court continued:
Tedesco also believes that Mr. Kim-ball’s failure to sign the sheriff’s book under oath is fatal to FBT’s deficiency judgment action. La.Rev.Stat. Ann. § 13:4365(A) provides that “[t]he appraisers shall take an oath to make a true and just appraisal of the property.” Tedesco cites to a Louisiana Court of Appeal Fourth Circuit opinion in support of dismissal. See Bourgeois v. Sazdoff, 2963 (La.App. 4 Cir. 4/8/68); 209 So.2d 320. In Bourgeois, the defendant in a deficiency judgment action filed a number of challenges to the underlying executory process proceeding. See id. The court in Bourgeois pointed to a number of defects in the process but focused mainly upon whether the property was properly appraised. Id. at 325. The defendant apparently appointed himself as an appraiser and in doing so appraised the property at TWENTY FIVE THOUSAND ($25,000.00) DOLLARS. Id. The defendant-appraiser properly signed the appraisal and took an oath. Id. The plaintiff, like the defendant, also appointed himself as an appraiser and orally delegated to his lawyer the obligation to take the oath and sign the appraisal book. Id. The court reviewed the oath and held that neither the plaintiff nor his lawyer executed a proper oath, noting |17that the oath was not that “of the plaintiff as an appraiser nor [was] is it the oath of ... the attorney. The taking of an oath is a personal thing ... and it cannot be tak *664 en or subscribed in a representative capacity.” Id. The court referenced the appraisal made by an attorney for the plaintiff, noting that it was for FOUR THOUSAND 00/100 ($4,000.00) DOLLARS. Id. The sheriff in the case appointed a third appraiser due to the valuation difference between the two parties who signed the oath but failed to state his valuation of the property. Id. at 326. The sheriffs proces verbal stated that the third appraisal was for SIX THOUSAND 00/100 ($6,000.00) DOLLARS. Id. The court questioned how the sheriff could arrive at an appraised value in light of its appraiser’s failure to submit a valuation. Id. The court ultimately held that even if the sheriffs appraiser offered a valuation of the property, “the appraisement of plaintiff was clearly invalid for the lack of the oath, amounting to no appraisal at all.” Id.
The Bourgeois case is distinguishable from the instant matter as there is no dispute that the appraisers in this case were qualified. Mr. Kimball prepared two separate appraisals, both of which he electronically signed. The appraiser appointed by the sheriff for Tedesco took an oath and signed the appraisal book as to his amount, but did not produce a formal appraisal. This court does not believe that Tedesco has been prejudiced by Kimball’s failure to take an oath. Moreover, in John Deere Co. v. Loewer, 86-453 (La.App. 3 Cir. 4/8/87); 505 So.2d 973, 975, the Louisiana Court of Appeal Third Circuit noted that when “a creditor attempts to cause an unfair appraisal, the sale should be declared without appraisal; however, where there is substantial compliance with statutory appraisal requirements the court should not hold the sale without benefit of appraisal for purely technical reasons.” Id. The court went on to hold that “the lack of a formal oath [was] not so fundamentally defective as to render an appraisal invalid thereby denying a creditor a deficiency judgment.” Id. at 976. Tedesco takes issue with this case arguing that it is distinguishable because Kimball failed to sign the appraisal, sign the sheriffs office form, and did not take an oath. First, Kimball electronically signed his appraisal. Second, the court in Deere focused its attention not simply on the absence of an oath, but on whether the appraisal was unjust or unfair. See id. The court noted that an opponent to the deficiency judgment “must show that the appraisal was fundamentally defective i.e., an unjust, unfair appraisal by an | ^unqualified appraiser....” Id. The court reversed the judgment of the trial court and granted the requested deficiency judgment, noting that “[t]he record [was] void of any evidence that [plaintiff] attempted to circumvent the law and cause an unjust and unfair appraisal.” Id. Similarly, the court finds that the failure of Mr. Kimball to take a formal oath is not so fundamentally defective as to render the appraisal invalid, especially in light of the fact that Tedesco failed to show that FBT attempted to circumvent the law to cause an unjust and unfair appraisal, or even that the appraisal itself was unjust or unfair. Indeed, the goal of the appraisal was to obtain the highest price for the property and the appraisals accomplished this goal.
We find no error in the reasoning and rulings of the trial court on this issue. Therefore, the assignment of error concerning the validity of the FBT appraisal is without merit.
Finally, we address FBT’s second assignment of error: that the trial court erred in assessing costs against FBT, the prevailing party. Indeed, the judgment *665 reveals that the trial court assessed a portion of the sheriffs fees and all costs against FBT. La. C.C.P. art. 1920 provides:
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
In Clarkston v. Louisiana Farm Bureau Cas. Ins. Co., 07-0158, 07-1282, p. 40 (La.App. 4 Cir. 7/2/08), 989 So.2d 164, 191, we stated:
Thus, the general rule is that all costs, both the prevailing side’s and his or her own, are to be paid by the party cast, although the court may make an “equitable” different provision for costs. Bowman v. New Orleans Public Service, Inc., 410 So.2d 270, 271 (La.App. 4th Cir.1982). The assessment of costs against a prevailing party has been considered an abuse of discretion [absent] proof that the prevailing party incurred the costs pointlessly or engaged in other conduct that justified the 119assessment of costs against it. Amato v. Office of Louisiana Commissioner of Securities, 94-0082, p. 12 (La.App. 4 Cir. 10/3/94), 644 So.2d 412, 419.
We find nothing in the record to support the assessment of costs against FBT. Therefore, we reverse that part of the judgment, holding that all fees and costs be assessed against Tedesco and TTI.
Based on the foregoing, we recast the judgment as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that judgment is rendered in favor of First Bank and Trust and against Todd Tedesco, personally, and Todd Ted-esco Investments, L.L.C., jointly, severally, and in solido, in the full sum of $915,874.00, together with the full amount of sheriffs fees and commissions.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all costs and attorney’s fees are hereby assessed against Todd Tedesco and Todd Tedesco Investments, L.L.C., jointly, severally, and in solido.

AFFIRMED IN PART; AMENDED IN PART; RENDERED.

. Tedesco did not testify or appear at trial. Neither Tedesco nor TTI called any witnesses at trial.

. Whether or not the 25 June 2008 continuing guaranty was transferred to TTHB is one of the primary issues presented on appeal.

. Harrison could only say definitively that a new continuing guaranty was printed based on the data she brought to court.

. Even assuming her testimony is terminologically inexact, her testimony and/or the literal language of the continuing guaranty fully support FBT's position.